UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

IN RE YUNJI INC., SECURITIES LITIGATION

**MEMORANDUM AND ORDER**
19-CV-6403 (LDH) (SMG)

---

LaSHANN DeARCY HALL, United States District Judge:

Lead Plaintiff Shaji Mathew, on behalf of himself and all others similarly situated, brings the instant putative class action against Defendants Yunji, Inc. ("Yunji" or the "Company"); Morgan Stanley & Co. LLC, Credit Suisse Securities LLC, J.P. Morgan Securities LLC, and Tiger Brokers, Limited (f/k/a Top Capital Partners Limited); and Donald J. Puglisi[1] asserting claims for violations of §§ 11 and 15 of the Securities Act. Defendants move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint in its entirety.

## BACKGROUND[2]

**I.  Yunji's Business**

Yunji is a Chinese social e-commerce platform that sells a wide range of consumer products from "mainstream brands, emerging brands[,] and private labels" via its online platforms. (Cons. Am. Compl. ("Compl.") ¶ 15, 44, 47, ECF No. 30.) Yunji's range of products includes beauty and personal care items, household goods, food, computers and electronics, apparel, bags, baby and maternity products, and home appliances. (*Id.* ¶ 47.)

Yunji's platform and app are designed to promote its social e-commerce model, which seeks to drive up sales and membership growth through its members' own social media efforts. (*Id.* ¶¶ 45, 46.) Through the app, members and users can see what others are purchasing and

---

[1] Several other defendants were named in the Amended Complaint. (Am Compl. ¶¶ 16-21.) However, Plaintiff never filed proof of service as to those remaining defendants.

[2] The following facts are taken from the consolidated amended complaint and are assumed to be true for the purpose of this memorandum and order.

sharing. (*Id.* ¶ 45.) Members are encouraged to provide product descriptions, reviews, photos, and videos of the goods they have purchased. (*Id.*) Additionally, Yunji members are prompted to share information on the products they have purchased by sending invitations and recommendations to their social media contacts. (*Id.*) If a member's social-media contact purchases a shared item, the member who shared the item receives the advertised incentive on the product—such as a "Yunbi" or "Yun-coin." (*Id.*)

Traditionally, Yunji provided three main sales formats to market products to customers: flash sales (daily sales of selected items); supermarket (an online grocery store); and boutique virtual shops (brand items gathered into virtual stores). (*Id.* ¶ 48.) In 2018, Yunji offered 6,613 standard product units ("SPUs"), sourced from 1,369 suppliers, on its platforms on an average daily basis. (*Id.* ¶ 50.) These suppliers are vetted and subjected to continued monitoring for quality control. (*Id.* ¶ 53.) To support these efforts, Yunji has a product procurement team of over 268 employees to identify customer trends, procure the products it offers for sale, and manage its SPUs and supplies. (*Id.* ¶ 51.) Yunji also has a dedicated quality control team. (*Id.* ¶ 53.)

## II. The Introduction of Yunji's Marketplace

Yunji's initial business model was based on a first-party relationship model (the "1P model"), whereby Yunji would purchase or acquire goods from suppliers to sell directly to consumers. (*Id.* ¶ 5.) However, in the first quarter of 2019, which spanned from January 1, 2019 to March 31, 2019, Yunji launched the Marketplace as part of its platform. (*Id.* ¶ 59.) The Marketplace, a third-party relationship model (the "3P model"), enables third-party merchants to market and sell their goods directly to Yunji's customers and users. (*Id.* ¶ 5, 59.) Yunji

2

purported to launch this platform feature to "complement [its] existing direct sales business model." (*Id.* ¶ 60.)

### III. Yunji's Initial Public Offering ("IPO") and Reported Earnings

On March 21, 2019, Yunji initiated the IPO process to sell securities on the United States markets. (*Id*. ¶¶ 33-43.) On May 3, 2019, Yunji completed its IPO, selling 11,000 American Depository Shares ("ADSs") to investors. (*Id.* ¶ 39.) The ADSs were registered and offered pursuant to: a registration statement on Form F-1 filed with the SEC on March 21, 2019, with the amendments made thereto ("Form F-1"), a registration statement on Form F-6 filed with the SEC on April 22, 2019 ("Form F-6"), a registration statement on Form 8-A filed with the SEC on April 22, 2019 ("Form 8-A"), and a final prospectus filed with the SEC on Form 424 on May 3, 2019 (the "Prospectus") (collectively, the "Registration Statement"). (*Id.* ¶ 3.)

In the Registration Statement, Yunji reported $1.893 billion in total revenue from three main sources: 87.5% from merchandise sales; 11.9% from the sales of memberships; and 0.6% from "other sources," which included third-party sales of tickets, mobile phones, hotel reservations, and insurance on Yunji's platform. (*Id*. ¶ 56, 57.) From the merchandise sales, Yunji recognizes revenue on a "gross basis." (*Id*. ¶ 57.) In other words, the total price of a sale to the customer is recorded as revenue. (*Id*.) In addition to revenue, Yunji also reported gross merchandise value ("GMV"), or, the total value of all orders paid and shipped for merchandise sold on Yunji's platform. (*Id.* ¶ 58.)

### IV. The IPO Offering Documents and Disclosures

    a.  <u>The Marketplace Disclosures</u>

The Marketplace was launched prior to Yunji's IPO and the Registration Statement contained information regarding Yunji's Marketplace. (*Id.* ¶ 60.) The Registration Statement

3

first notes:[3] "We have launched the marketplace business model since the first quarter of 2019, and will continue to work with third-party online payment service providers to support the new initiatives." (Fumerton Decl. Supp. Mot. Dismiss, ECF No. 36, Ex. A ("Prospectus") 33, ECF No. 36-1.)  In a section labeled "Business Strategies" the Registration Statement indicates: "By leveraging our large user base and power of social networks, we have launched the marketplace business model since the first quarter of 2019, allowing third-party merchants to sell their products on our platform to our members and users."  (Prospectus at 117.)  Lastly, in a section regarding Yunji's product offerings, the Registration Statement indicates Yunji offers products in three sales formats—flash sale, supermarket, and boutique virtual.  (Prospectus at 123-124.) Following a brief description of each, the Registration Statement notes:

> To complement our existing direct sales business model, we have launched a marketplace business since the first quarter of 2019 whereby third-party merchants can sell products on our platform and pay us commissions on their sales. We believe this can help further expand our product offerings, improve the shopping experience, and attract and retain more members and users.

(Prospectus at 124.)

    b.  Quality Control Disclosures

The Registration Statement also contained disclosures regarding Yunji's procurement and quality control procedures for Yunji's 1,369 suppliers (as of the December 2018).  (*Id.* ¶ 109.) For example, Yunji emphasized the importance it places on carefully selecting suppliers with high-quality product offerings in order to carefully curate product selection.  For example: "We offer broad coverage of product categories to cater to the various daily needs of our users and

---

[3] The Prospectus referenced herein was not attached but is incorporated by reference to the complaint. *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) ("[A] district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference.")

their households, but provide carefully curated items within each category to meet the preferences of our users." (Prospectus at 84.) As another example:

> We offer a carefully curated selection of quality products at attractive prices on our platform to help fulfill the various daily needs of our users and their households based on our understanding of their preferences. We have been continuously expanding the product categories available on our platform with the help of big data and analytics.

(Prospectus at 116.) In addition, the Registration Statement endeavored to describe the Company's measures to maintain quality. For example, the Company represented it "review[s] and continually monitor[s] the performance of each SPU based on a few key dimensions, in particular revenue contribution and margin, and suspend and replace SPUs with poor performance each month." (Prospectus at 123.) And,

> Although we have adopted strict measures to protect us against these potential liabilities, including proactively verifying the authenticity and authorization of products sold on our platform through conducting offline investigations and immediately removing any counterfeit or illegal products or misleading information found on our platform, these measures may not always be successful or timely.

(Prospectus at 26.)

**V.     Yunji's Post-IPO Disclosures**

    a.  <u>First Quarter 2019 Results</u>

Following the IPO, on June 4, 2019, Yunji announced its first quarter 2019 financial results. (Compl. ¶ 62.) Yunji's GMV increased by 93.7% year over year, total revenue decreased 24%, and Yunji's revenue from the sale of merchandise decreased 8.4%. (*Id.* ¶¶ 63-64.) In a related press release, Yunji noted many brands opted into the company's marketplace model, which recognized revenue on a net basis. (*Id.* ¶ 64.) Yunji reiterated this information during an earnings call held later that day. (*Id.* ¶ 68.)

b.  Second Quarter 2019 Results

On August 22, 2019, Yunji announced its second quarter results. (*Id.* ¶ 73.) Again, Yunji's GMV increased, but total revenue decreased 9.5% from the first quarter of 2019 and revenues from sales of merchandise decreased 15.17% from the first quarter of 2019. (*Id.* ¶ 74, 76.) During the earnings call, Yunji's Chief Financial Officer Chen explained:

> During the second quarter, we introduced more sales formats and that developed our marketplace business to meet the evolving demands of our members and users. Consequently, a portion of the revenues, which was previously generated from merchandise sales and recognized on gross basis, shifted to being generated from marketplace model and recognized on a net basis.

(*Id.* ¶ 78.) On the same call, Chen stated that during the second quarter Yunji eliminated 300 brands from its 1P model given they did not meet the Company's standards. (*Id.*)

c.  Third Quarter 2019 Results

On December 2, 2019, Yunji announced its third quarter 2019 financial results for a period ending September 30, 2019. (*Id.* ¶ 83.) Similar to the previous two quarters, Yunji's GMV increased, but total revenue decreased 9.5% from the previous quarter and revenue from the sales of merchandise decreased 9.5% from the previous quarter. (*Id.* ¶¶ 85-86.)

## STANDARD OF REVIEW

To withstand a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the alleged facts allow the court to draw a "reasonable inference" of defendants' liability for the alleged misconduct. *Id.* While this standard requires more than a "sheer possibility" of defendants' liability, *id.*, "[i]t is not the Court's function to weigh the evidence that might be presented at trial" on a motion to dismiss.

*Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999). Instead, "the Court must merely determine whether the complaint itself is legally sufficient, and, in doing so, it is well settled that the Court must accept the factual allegations of the complaint as true." *Id.* (citations omitted).[4]

## DISCUSSION

### I.     Section 11

Section 11 of the Securities Act imposes "strict liability on issuers and signatories, and negligence liability on underwriters" in a registered securities offering "when the registration statement . . . contains material misstatements or omissions." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) (citing 15 U.S.C. §§ 77k, 77l(a)(2)). Significantly, distinct from securities fraud cases under §10(b) of the Securities Act, plaintiffs bringing claims under § 11 need not allege scienter, reliance, or loss causation, thus in contrast, § 11 "appl[ies] more narrowly but give[s] rise to liability more readily." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359–60 (2d Cir. 2010).

"To state a claim under section 11, the plaintiff must allege that: (1) [he] purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under

---

[4] Typically, a plaintiff seeking to avoid dismissal of a securities complaint must also satisfy the heightened pleading requirements under Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act ("PSLRA"). *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 110 (2d Cir. 2009); *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012). However, given a claim under Section 11 of the Securities Act does not require scienter, reliance, or loss causation, "the structure of the analysis is guided by a preliminary inquiry into the nature of the plaintiff's allegations." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358-60 (2d Cir. 2010). Where, as here, Plaintiff's pleadings do not sound in fraud, then "[Plaintiff] need not satisfy the heightened particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure." *Panther Partners Inc.*, 681 F.3d at 119. Nor do the heightened pleading standards of the PSLRA apply to such non-fraud claims. *Id.* "Therefore, notice pleading supported by facially plausible factual allegations is all that is required[.]" *In re Morgan Stanley*, 592 F.3d at 358. Accordingly, any argument by Defendants that the complaint should be dismissed for failure to meet 9(b)'s particularity standard, is without merit.

section 11; and (3) the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *Id.* at 358–59 (internal quotations omitted).  As the Second Circuit has indicated, in many cases, the two central issues are: "(1) the existence of either a misstatement or an unlawful omission; and (2) materiality," or, "[w]hether the defendants' representations, taken together and in context, would have misled a reasonable investor." *Id.* at 360.

Here, the consolidated amended complaint alleges the Registration Statement contained three primary misstatements and omissions:  (1) the Registration Statement provided a materially misleading description of the Company by omitting information concerning the 3P model Yunji launched through Marketplace, in violation of Item 101 of Regulation S-K, 17 C.F.R. § 229.101 ("Item 101"); (2) the Registration Statement omitted discussion of material trends in Yunji's sales from its 1P model to the Marketplace, in violation of Item 303 of Regulation S-K, 17 C.F.R. § 229.303 ("Item 303"); and (3) the Registration Statement contained untrue statements and omitted material facts concerning Yunji's quality control measures as to the products offered from its suppliers.  (Compl. ¶¶ 5-7)

### a. Item 101

Item 101 generally requires a registrant describe the general development of the business, its subsidiaries, and any predecessors.  17 C.F.R. § 229.101; *see also Inner City Press/Cmty. on the Move v. Bd. of Governors of Fed. Rsrv. Sys.*, 463 F.3d 239, 250 (2d Cir. 2006).  Specifically, registrants must "[d]escribe the business done and intended to be done by the registrant and its subsidiaries, focusing upon the registrant's dominant segment or each reportable segment about which financial information is presented in the financial statements." 17 C.F.R. § 229.101(c)(1).  This includes the status of any developmental efforts for new

products. *Id.* § 229.101(c)(1)(ii). And, "[w]hen describing each segment, only information material to an understanding of the business taken as a whole is required." *Id.* Here, Plaintiff argues that Defendants violated Item 101's disclosure requirements by failing to adequately describe the Marketplace, its promotion in the first quarter of 2019, and its growing role in Yunji's operations. (Pl.'s Mem. Opp'n Mot. Dismiss ("Pl.'s Mem.") 14, ECF No. 37.)

Defendants first argue Plaintiff fails to establish Yunji had a duty to disclose this information. (Defs.' Mem. Supp. Mot. Dismiss ("Defs.' Mem.") 13-14, ECF No. 35.) As Defendants' argument goes, SEC regulations only require an issuer to include within its registration statement financial information more than 135 days old. (Defs.' Mem 14 (citing 17 C.F.R. § 210.3-12(a), (g)(ii))). As such, Item 101 does not require disclosure of the Marketplace business, because it was not among the "reportable segments" of the Company's business at the time of the IPO. (Defs.' Mem. 14.) Plaintiff does not respond. And, Defendant's argument is, at least, facially supported by the text of Item 101, which indicates a company's business description should "focus[] upon the registrant's dominant segment or each reportable segment *about which financial information is presented in the financial statements*." 17 C.F.R. § 229.101(c)(1) (emphasis added).

Even assuming that Item 101 required disclosure of the Marketplace, the Court agrees Defendants adequately complied with Item 101's requirements. The crux of Plaintiff's argument is that Yunji failed to adequately describe the Marketplace and its launch as a "new sales format." (Pl.'s Mem. 14-15.) However, as Defendants argue, the Registration Statement did exactly that by indicating "the marketplace *business model*" was launched "*[t]o complement* our existing direct sales business model," which was an example of Yunji's efforts to "further invest in *other sales formats*." (Prospectus at 33, 117, 123 (emphasis added).) Plaintiff's efforts to cast

9

the Registration Statement as misleading investors to believe the Marketplace was "just a subsection of the boutique virtual shops format" is unconvincing and betrayed by the Registration Statement itself. (*See* Pl.'s Mem. 14.) Indeed, the instances where the Marketplace was explicitly referenced in the Registration Statement, it was made clear that it was a new initiative and a departure from Yunji's more-traditional platform. For example,

- We have launched the marketplace business model since the first quarter of 2019, and will continue to work with third-party online payment service providers to support the *new initiatives*, (Prospectus at 33 (emphasis added));

- [W]e have launched the *marketplace business model* since the first quarter of 2019, allowing third-party merchants to sell their products on our platform to our members and users, *(id.* at 117 (emphasis added)); and

- To complement our existing direct sales business model, we have launched a marketplace business since the first quarter of 2019 whereby third-party merchants can sell products on our platform and pay us commissions on their sales, *(id.* at 124 (emphasis added)).

The Court finds Plaintiff's argument even less persuasive where, as the Registration Statement makes clear, at the time of IPO, Yunji's primary business model was based on direct sales. (*Id.* at 99.)

Plaintiff's argument that Defendants failed to adequately disclose its promotion of the new feature also falls short. (Pl.'s Mem. 16.) As Defendants' argue, Yunji's announcement that it "launched" a new marketplace initiative necessarily implies that the Company was promoting it. (Prospectus at 124.) Further, the Registration Statement indicates Yunji was working with "third-party online payment service providers to support the new initiative[]." (*Id.* at 33.)

In addition, Plaintiff argues that the Registration Statement failed to disclose the Marketplace's expected impact on revenue and the basis by which revenue would be recognized. (Pl.'s Mem 15.) However, this argument also fails for several reasons. *First*, Plaintiff does not sufficiently argue, nor is the Court persuaded, this information is required by Item 101 in the first

10

instance. On its face, Item 101 requires registrants to describe only the "business done and intended to be done by the registrant and its subsidiaries." 17 C.F.R. § 229.101. And, Plaintiff cites no authority to support its interpretation. *Second*, the Registration Statement did provide at least some of the information Plaintiff complains was omitted. In the Recent Development sections, the Registration Statement provides preliminary financial information from the first quarter of 2019, indicating:

> Our GMV increased by 93.7% from RMB3.5 billion in the three months ended March 31, 2018 to RMB6.8 billion in the three months ended March 31, 2019, based on a total of 40.0 million orders fulfilled and 7.3 million buyers in the three months ended March 31, 2019. Our revenues did not grow as fast as our GMV during the same periods, mainly due to (i) the increased contribution of emerging brand and private label products to our GMV, for which members receive more referral incentives than from sales of mainstream brand products, and (ii) *the increase in the sales of goods and services for which we recognize revenue on a net basis*.

(Prospectus at 5) (emphasis added). And, later, the Registration Statement indicates that through Marketplace "third-party merchants . . . pay us commissions on their sales." (*Id.* at 124.)

Ultimately, Plaintiff has failed to allege that Yunji's Registration Statement violated any duty to disclose pursuant to Item 101. Accordingly, Plaintiff's claim on this ground fails.

### b. Item 303

In relevant part, Item 303 requires registrants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303.; *see also Stratte McClure* v. *Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015). And, "[a]ccording to the SEC's interpretive release regarding Item 303, the Regulation imposes a

11

disclosure duty 'where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations.'" *Panther Partners Inc.*, 681 F.3d at 120 (citing Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 6835, Exchange Act Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC Docket 1330 (May 18, 1989)). Here, Plaintiff principally alleges that Defendants ran afoul of Item 303 when they failed to disclose that Yunji "had and was continuing to experience a shift of its sales to the company's Marketplace and the manner in which the shift had and was reasonably expected to materially impact the company's revenue." (Compl. ¶ 104.) To this point, Plaintiff emphasizes that, at the time of the IPO, Yunji's first quarter had been completed for over a month and Yunji was 36% of the way through its second quarter. (Compl. ¶¶ 62, 73.)

As a threshold matter, Defendants contend that the launch of Marketplace was a "business strategy decision," which need not be disclosed under Item 303. (Defs.' Mem. 16-17.) This argument, however, mischaracterizes Plaintiff's argument, which in fact alleges that Yunji failed to disclose the reasonably expected *impact* on Yunji's revenue from the Marketplace—not simply the launch of the Marketplace. (Pl.'s Mem. 16-18.) That said, while the Court agrees that Item 303 does not require disclosure of Defendants' business strategies so as to not "give competitors notice of proprietary strategies and information," it does require disclosure of any known trends and the manner in which said trend "might reasonably be expected to materially impact a company's overall financial position." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 105 (2d Cir. 2015) (internal quotation omitted). And, the alleged impact on Yunji's net revenue following the launch of Marketplace, cannot properly be characterized merely as an

12

"internal business strategy[y]." *Cf. Steamfitters Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494, 498 (2d Cir. 2019) (summary order) (characterizing defendants "secret plan to transform [its] generics business" after leaving "investors with the false impression that" no drastic changes would be made as a "business decision" not subject to disclosure under Item 303); *see also City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 426 (S.D.N.Y. 2020) (characterizing a company's plan to "remove sales and integration employees and replace them with less experienced, less paid staff" as a business decision, rather than a trend under Item 303).

The Court also declines to find, as Defendants' urge, that one fiscal quarter is an insufficient amount of time to establish a trend as a matter of law. (Defs.' Mem. 17); *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 122 (2d Cir. 2012) ("Item 303's disclosure obligations, like materiality under the federal securities laws' anti-fraud provisions, do not turn on restrictive mechanical or quantitative inquiries."). Certainly, in considering whether a trend exists, the amount of time over which the events at issue are alleged to have developed is a factor the Court must take into account. By way of reference, the Cambridge Dictionary defines a trend as "a general development or change in a situation," which necessarily implicates the passage of time. Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/trend (last visited Mar. 31, 2021). Brightline rules of temporality are of limited usefulness. Instead, an inquiry into the existence of a trend must account for both the type of trend alleged to exist and the amount of time it might take for said trend to manifest under the circumstances. In this case, Plaintiff' alleges that the trend at issue is a shift in Yunji's overall sales to the Marketplace resulting in a negative impact on the company's net revenue. However, the Registration Statement cautioned Yunji "generally experience[s] less user traffic and purchase orders during

13

the Chinese New Year holiday seasons in the first quarter of each year." (Prospectus at 34.) This seasonal downturn at least overlaps with the period during which Plaintiff maintains the trend occurred. Taken together, this Court is not persuaded one fiscal quarter was sufficient to plausibly establish any trend related to the Marketplace. *See, e.g. Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc*., No. 07 CIV. 10528, 2010 WL 148617, at *10 (S.D.N.Y. Jan. 14, 2010) (dismissing Plaintiff's claim based on a violation of Item 303 where, in part, Plaintiff failed to plausibly allege a trend).

Defendants further argue that even if Plaintiff had sufficiently alleged the existence of a trend, Plaintiff has not sufficiently pleaded Yunji knew of any such trend. (Defs.' Mem. 17; Defs.' Reply Mem. Supp. Mot. Dismiss ("Defs.' Reply") 6-7, ECF No. 38.) The Court agrees. The Second Circuit has made clear that Item 303 "requires the registrant's actual knowledge of the relevant trend or uncertainty." *Indiana Pub. Ret. Sys. v. SAIC, Inc*., 818 F.3d 85, 95 (2d Cir. 2016). Indeed, "[i]t is not enough that [a company] should have known of the existing trend, event, or uncertainty." *Id.* Here, Plaintiff alleges Yunji management was promoting the marketplace for months, that it negatively affected Yunji's net revenue during the first quarter of 2019, which concluded a month before the IPO, and that Yunji management expressly addressed the Marketplace and its impact in certain disclosures subsequent to the IPO. (Compl. ¶ 6, 102-104.) As Plaintiff's argument goes, these facts are sufficient to plead that it was plausible Yunji's management knew of the material impact of the Marketplace on Yunji's new revenues at the time of the IPO. (Pl.'s Mem. 16-17.)

In support of this argument, Plaintiff directs the Court to two cases. (Pl.'s Mem. 17-20.) In *Panther Partners Inc. v. Ikanos Commc'ns, Inc*., the court held plaintiff plausibly alleged defendant was required, but failed, to disclose known defects in the company's semiconductor

14

chips. 681 F.3d at 116. There, the complaint alleged that prior to the defendant's secondary offering of its securities, the company received a number of complaints regarding the chips, and the company's board of directors met among themselves, and with company representatives, to discuss the issue. *Id*. at 116-117. Also of note to the Second Circuit, the company had received complaints from two customers that, together, represented 72% of the company's revenue. *Id*. at 121. Based on these allegations, the Second Circuit concluded that a plausible inference could be drawn that, "at a time when [the company] was receiving an increasing number of calls from these customers and its Board of Directors was discussing the issue, [the company] was aware of the 'uncertainty' that it might have to accept returns of a substantial volume, if not all, of the chips it had delivered to its major customers." *Id*. at 121. Indeed, the court continued, "[it went] without saying that such 'known uncertainties' could materially impact revenues." *Id*. at 121-22. Plaintiff also cites *In re Facebook, Inc. IPO Securities and Derivative Litigation* ("*Facebook*"). 986 F. Supp.2d 487, 508 (S.D.N.Y. 2013). In *Facebook*, the plaintiffs alleged the loss of revenue caused by increasing mobile usage was a known trend, that Facebook had a duty to disclose prior to its IPO. 986 F. Supp.2d at 508. There, the court held that Facebook's disclosures did not meet its obligations under Item 303 where, in advance of the IPO, the company's changes to its internal projections and calls to syndicate analysts established that the company had identified a trend. *Id*. at 512.

However, these cases are distinguishable. Here, unlike in *Panther Partners* and *Facebook*, Plaintiff does not allege facts by which this Court could make a plausible inference that Yunji management was aware of impact the Marketplace would ultimately have on its revenue. Pre-IPO, Plaintiff offers only that Yunji promoted the Marketplace. (Compl. ¶ 36.) That fact simply does not allow for the inference that Yunji was aware of any trend that initiative

15

might have.  Absent are any allegations, for example that Yunji management had concerns regarding any alleged downturn in revenue or otherwise discussed shifts in the Company's revenue or that Yunji took affirmative action that suggests that the Company identified the trend.  The remaining allegations offered in support of Plaintiff's theory of liability all relate to events that occurred post-IPO.  (*See, e.g.*, Compl. ¶¶ 103-104.)  While, Plaintiff is correct that a court may look at statements about post-IPO impact to determine if a trend existed at the time of an IPO, Plaintiff identifies no case where post-IPO disclosures alone were sufficient.  For example, *In re Blue Apron Holdings, Inc. Sec. Litig.*, the district court found that "[t]he post-IPO earnings call demonstrated the delays at the Linden Facility in fact adversely affected Blue Apron's financial condition."  No. 17-CV-4846 (WFK), 2020 WL 1950783, at *9 (E.D.N.Y. Apr. 22, 2020).  Critically, and conspicuously omitted from Plaintiff's submission, the court also recognized "[t]he post-IPO statements by Blue Apron are not dispositive," but rather, "coupled with the allegations Blue Apron knew delays at Linden would cause material impacts on the company . . . and knew of ongoing delays at [the fulfillment center] prior to the IPO. . . the Court [drew] the inference Blue Apron managers reasonably expected the delays at Linden to be material prior to the IPO."  *Id.*  Those sorts of facts are note present here.

Accordingly, Plaintiff has failed to adequately allege Defendants violated any duty to disclose pursuant to Item 303.

**II.     Misrepresentations**

Plaintiff argues that the Registration statement contained untrue statements and/or omitted material facts concerning Yunji's product offerings.  (Pl.'s Mem. 20-22.)  Plaintiff takes specific issue with Yunji's representations that the products it offered were "high-quality" and "carefully curated" from suppliers.  (Compl. ¶ 7.)  In support, Plaintiff points toward

16

representations from Yunji's CFO that during the second quarter of 2019, Yunji cut 300 of its merchandise suppliers for failing to meet the Company's standard for quality. (*Id.*) In response, Defendants argue the challenged statements are non-actionable puffery that do not give rise to securities violations. (Defs.' Mem. 19.) The Court agrees.

The Second Circuit has made clear that "[e]xpressions of puffery and corporate optimism do not give rise to securities violations." *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 13 (2d Cir. 2019) (citing *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004)). This includes statements, such as a company's "generalizations regarding [its] business practices," that are "too general to cause a reasonable investor to rely upon them." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (determining the defendant's representations regarding its "highly disciplined risk management" and "standard setting reputation for integrity" were considered nonactionable puffery). Here, Plaintiff's allegations focus on descriptors in the Registration Statement like "high-quality" and "curated," which as applied generally to several categories of products, are neither quantifiable nor factual, but rather "subject to interpretation, within reason, and are statements of opinion." *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 174 (E.D.N.Y. 2017), aff'd, 731 F. App'x 35 (2d Cir. 2018) (finding "[w]ords like 'mindful,' 'humane,' 'genuine,' and 'authentic', to be nonactionable puffery).

Plaintiff's cited authority, specifically addressing the term "high quality," does not convince the Court otherwise. In *Arkansas Teacher Ret. Sys. v. Bankrate, Inc.*, the court considered whether a company's use of the term "high-quality" to describe its insurance leads during an earnings call was a material misrepresentation. 18 F. Supp. 3d 482, 485 (S.D.N.Y. 2014). In reaching its determination the court highlighted that, at the same time the company

17

was making representations as to the quality of the insurance leads, approximately "approximately $12 million worth of [the company's] insurance leads were determined to be of such poor quality that they could not be sold and were effectively worthless." *Id*. As a result, the court concluded that defendants' representations were not mere puffery, but rather material misstatements. *Id*. Of particular relevance here, the court noted while "a term like 'high quality' might be mere puffery or insufficiently specific to support liability in some contexts," there, it was "clearly a material misrepresentation when applied to assets that are entirely worthless, as were large percentages of [the company's] leads." *Id*. This instant action presents one such context. Unlike the bank leads at issue in *Arkansas Teacher Ret. Sys.*, the products Yunji offered cannot be judged on objective criteria. Indeed, the complaint fails altogether to identify any specific criteria against which the products might be judged.

Plaintiff also cites *Freudenberg v. E*Trade Fin. Corp*., where the court considered the defendants' contention that their misstatements regarding the quality of the company's "risk management, discipline, monitoring and credit quality" were "mere puffery." 712 F. Supp. 2d 171, 189-91 (S.D.N.Y. 2010). There again, the court noted the term "high quality" could be actionable as a material misstatement. *Id*. However, the Court determined the misstatements were actionable because they were "belied by conditions internally known to defendants," as "juxtaposed against detailed factual descriptions of the Company's woefully inadequate or non-existent credit risk procedures." *Id*. at 190. In other words, they were "misrepresentations of existing fact." *Id*. at 189. This case is also distinguishable. Here, Plaintiff makes only conclusory allegations that the Company's procurement and quality-control measures were inadequate. (Compl ¶ 110.) These allegations do not support an inference that the Company's representations regarding the high-quality nature of its products were untrue at the time they

18

were made.[5] Rather, several months *after* the IPO, Yunji removed the brands from the platform.[6]

## III.    Section 15

Section 15 of the Securities Act "imposes joint and several liability on [e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under [§ 11]." *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 490 (2d Cir. 2011) (citing 15 U.S.C. § 77o(a)). Thus, in order to establish liability under § 15, "a plaintiff must show a primary violation of § 11 and control of the primary violator by defendants." *Id.* (internal quotations omitted). Here, because the Court has found the complaint does not state a claim under § 11, Plaintiff's claim under § 15 must be dismissed as well. *Id*; *see also Rombach v. Chang*, 355 F.3d 164, 178 (2d Cir. 2004).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the complaint for failure to state a claim is GRANTED.[7] Within seven (7) days of the entry of this memorandum and order,

---

[5] The Court also notes that Plaintiff appears to conflate Yunji's suppliers and its brands. During the August 22, 2019 earnings call, Yunji's chief financial officer represented "in Q2, we eliminated around 300 brands out of Yunji in Q2 and the [1P] model." (Compl. ¶ 79.). As Defendants point out, Yunji's suppliers are distinct from its brands. (Defs.' Mem. 19. n.10).

[6] In any event, even if Yunji's statements were not puffery, Plaintiff's allegations concerning subsequent disclosures do not persuade the Court the Registration Statement was inaccurate. As advanced in the Registration Statement, Yunji's products were of "high quality" and "carefully curated." (Compl. ¶ 7.) To ensure products met the company's standards, the Company maintained a product procurement team and established a set of guidelines for identifying suppliers. (Compl. ¶¶ 52-54.) Once suppliers were chosen, Yunji maintained a dedicated team to monitor the products for quality control. (Compl. ¶¶ 52-54.) Against these facts, a reasonable inference to be drawn is that the elimination of suppliers from the platform that did not meet the Company's standards is an execution of the processes outlined in the disclosures.

[7] In a footnote to his opposition Plaintiff requests leave to file an amended complaint. (Pl.'s Mem. 24.) However, Plaintiff has already filed an amended pleading through the filing of the Consolidated Amended Class Action Complaint. (ECF No. 30.) Although, pursuant to Rule 15 of the Federal Rules of Civil Procedure, "[t]he Court should freely grant leave when justice so requires," ultimately, "it is within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Accordingly, if Plaintiff still seeks to file an amended complaint, Plaintiff shall request leave from the Court in a submission not to exceed five (5) pages and accompanied by the proposed amended pleading on or before April 13, 2021.

19

Plaintiff shall show cause as to why his claims against Shanglue Xiao, Chen Chen, Huan Hao, Qingrong Kong, Yanhua Sun, Wei Yang, and China International Capital Corporation Hong Kong Securities Limited should not be dismissed pursuant to Rule 4(m) of the Federal Rules of Civil Procedure for failure to prosecute.

                                            SO ORDERED.

Dated:  Brooklyn, New York                /s/ LDH
       March 31, 2021                       LASHANN DEARCY HALL
                                             United States District Judge